James E. Cecchi
Jason H. Alperstein
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

*Attorney for Plaintiff and the Proposed Class*

[*Additional Attorneys on Signature Page*]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARLON ST. JOHN, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONDUENT BUSINESS SERVICES, LLC, and HEALTH CARE SERVICE CORPORATION d/b/a BLUE CROSS AND BLUE SHIELD OF ILLINOIS,<br><br>Defendants. | Case No.: ____________________<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Marlon St. John ("Plaintiff"), by his undersigned counsel, files this Class Action Complaint on behalf of himself and a class of all similarly situated persons against Defendants Conduent Business Services, LLC ("Conduent") and

Health Care Service Corporation, a Mutual Legal Reserve Company d/b/a Blue Cross and Blue Shield of Illinois ("BCBSIL"). Plaintiff bases the forgoing allegations upon personal information and belief, the investigation of counsel, and states the following:

## INTRODUCTION

1. Plaintiff brings this class action complaint on behalf of a class of persons impacted by Defendants' failure to safeguard, monitor, maintain, and protect highly sensitive Personally Identifiable Information ("PII") and Protected Health Information ("PHI") (together, "Sensitive Information"). Conduent collected, stored, and maintained Plaintiff's and the Class's Sensitive Information as part of its business activities as a back-office service provider to commercial and governmental entities, including entities covered by the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d, *et seq.*

2. BCBSIL is a customer of Conduent and provided Conduent with the Sensitive Information of BCBSIL's own customers, including Plaintiff.

3. On October 21, 2024, cybercriminals gained access to Conduent's networks. The cybercriminals enjoyed that access for three months, during which time they exfiltrated files associated with Conduent's clients. Those files included

Sensitive Information such as names, dates of birth, Social Security numbers, treatment information, and claims information.[1]

4. Despite its discovering the attack in January 2025, it was not until October 24, 2025—a year after the attack—that Conduent began providing notice to impacted individuals.[2]

5. The type of information impacted by the Data Breach can be used to orchestrate a host of fraudulent activities, including financial and medical fraud and identity theft. Indeed, a driving purpose of these types of data breaches is to obtain and misuse victims' Sensitive Information or to make it available on the dark web for misuse. Information such as the Sensitive Information accessed during the Data Breach may also be used to fraudulently obtain medical services, or to perform additionally targeted phishing or hacking attacks directed at the victims of the Data Breach. Consequently, all impacted individuals are at a heightened and substantial risk that their information will be disclosed to criminals and misused for attempted or actual fraud or identity theft.

6. On October 24, 2025, Conduent sent Plaintiff notice that he had been impacted by the data breach. As a direct result of the breach, Plaintiff suffers from

---

[1] https://www.hipaajournal.com/conduent-business-solutions-data-breach/

[2] *Data Breach Notifications*, Office of the Maine Attorney General https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/389e9d0d-8e23-497d-aaab-1c4c8a80707f.html (last visited October 28, 2025).

an increased risk of harm due to the exposure and potential misuse of his personal data by criminal hackers.

7. As such, Plaintiff brings this Complaint on behalf of persons whose Sensitive Information was stolen during the Data Breach.

## JURISDICTION

8. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, there are 100 members or more in this proposed class, and at least one of those class members will be diverse from Defendant.

9. This Court has general personal jurisdiction over Conduent because maintains its principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey.

10. This Court has specific personal jurisdiction over BCBSIL because BCBSIL sent Plaintiff's information to Conduent in the District of New Jersey and because the transaction and breach occurred there.

11. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to

Plaintiff's claims occurred in this District, and because Defendant conducts a substantial part of their business and are headquartered within this District.

## PARTIES

12. Plaintiff Marlon St. John is a citizen of Chicago, Illinois and a customer of Blue Cross and Blue Shield of Illinois, a HIPAA-cover entity to whom Conduent provided services. Conduent obtained and maintained the Sensitive Information of Plaintiff and owed him a legal duty and obligation to protect and secure that Sensitive Information from unauthorized access or disclosure.

13. Plaintiff St. John received notice of the Data Breach from Conduent via mail on or about November 3, 2025. Plaintiff St. John suffered actual injury from having his Sensitive Information exposed as a result of the Data Breach, including: (a) time and effort monitoring his accounts for fraudulent charges and to mitigate the risk of harm from the Data Breach; (b) entrusting Sensitive Information to Conduent that he would not have had Conduent disclosed that it lacked data security practices adequate to safeguard its patients; (c) damages to and diminution in the value of his Sensitive Information—a form of intangible property that he entrusted to Conduent as a condition of receiving healthcare services; (d) loss of his privacy; and (e) continuous imminent an impending injury arising from the increased risk of financial, medical, and identity fraud and theft.

14. Defendant Conduent Business Services, LLC is a Delaware corporation

with its headquarters and principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey.

15. Defendant Health Care Service Corporation is an Illinois corporation with its principal place of business at 300 E. Randolph St. FL 4, Chicago, IL 60601.

## FACTUAL ALLEGATIONS

### A. Defendants Failed to Safeguard the Sensitive Information it Collects from its Customers.

16. Conduent is a provider of "third-party printing/mailroom services, document processing services, payment integrity services, and other back-office support services,"[3] serving entities in both the private and public sectors.[4]

17. Defendant BCBSIL is one such customer.

18. In the course of providing those serving its customers, Conduent collects Sensitive Information, including information such as name, social security number, medical information, and health insurance information.[5]

19. From October 21, 2024, to January 13, 2025, cybercriminals enjoyed unimpeded access to that Sensitive Information, occupying Conduent's network and exporting files containing the Sensitive Information.[6]

[3] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/389e9d0d-8e23-497d-aaab-1c4c8a80707f.html
[4] https://www.cbs42.com/business/press-releases/cision/20251023SF05607/premera-blue-cross-responds-to-conduent-data-security-incident/
[5] https://www.conduent.com/notice-2912609/
[6] https://www.conduent.com/notice-2912609/

20. Given the duration and the means by which it occurred, the Data Breach could only have happened with significant and highly concerning data security deficiencies that Conduent knew or should have known created a significant risk of harm to millions of individuals.

**B. Conduent Knew It Needed to Protect Users' Sensitive Data**

21. Defendant Conduent is a business associate of HIPAA covered entities like BCBSIL and is therefore covered by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (*see* 45 C.F.R. § 160.102).

22. HIPAA security standards require organizations to "[p]rotect against any reasonably anticipated threats or hazards to the security or integrity of such information."[7]

23. The rationale behind these stringent recommendations is self-evident, as the healthcare industry is particularly vulnerable to cyberattacks.

24. According to a report from the Identity Theft Resource Center, in the first half of 2025 there were 1,732 publicly reported data breaches, including 283 healthcare data breaches.[8]

---

[7] 45 C.F.R. § 164.306.

[8] Identity Theft Resource Center, *Identity Theft Resource Center Sees Acceleration of 2024 Data Breach Trends in First Half of 2025*, (July 16, 2025) https://www.idtheftcenter.org/post/h1-2025-data-breach-report-data-breach-trend-continues/ (last visited July 25, 2025).

25. The increased risk to healthcare entities was known and obvious to Defendant as it observed frequent public announcements of data breaches affecting PHI and knew that information of the type they collect, maintain, and store is highly coveted and a frequent target of hackers.

26. There have been recent high profile cybersecurity incidents at other healthcare partner and provider companies, including: HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023), American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019, Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), BJC Health System (286,876 patients, March 2020), Change Healthcare (190 million patients, February 2024).

27. Defendants were fully aware of their obligations to implement and use reasonable measures to protect the Personal Information of patients but failed to comply with these basic recommendations and guidelines that would have prevented

this Data Breach from occurring. Defendants' failure to employ reasonable measures to protect against unauthorized access to patient Personal Information violated HIPAA and constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

28. Defendants have received ample warning of the need to protect sensitive data from the FTC.

29. For example, the FTC has issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security into all business decision-making.[9] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[10]

---

[9] Federal Trade Comm'n, *Start with Security A Guide For Business, Lessons Learned from FTC Cases* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[10] *Id.*; Federal Trade Comm'n, *Protecting Personal Information, A Guide For Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

30. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

31. As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore

networks . . ."). These orders, which all preceded Defendants' Data Breach, further clarify the measures businesses must take to meet their data security obligations.

**C. Defendants Failed to Implement Reasonable Safeguards**

32. Conduent could have minimized or altogether prevented the Data Breach by taking reasonable steps to properly secure and encrypt the Sensitive Information of Plaintiff and the Class and by maintaining a reasonable information retention policy to delete unnecessary Sensitive Information.

33. Given the duration and the means by which it occurred, the Data Breach could only have happened with significant and highly concerning data security deficiencies that Conduent knew or should have known created a significant risk of harm to millions of individuals.

34. In all, Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data-security system to reduce the risk of data breaches and cyberattacks
- Failing to meet the standards established by its data-security and privacy policies
- Failing to adequately protect PII and PHI entrusted to it
- Failing to properly monitor its own data security systems for existing intrusions
- Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures

- Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices
- Failing to adhere to industry standards for cybersecurity.

35. BCBSIL likewise failed to adequately safeguard Plaintiff and the Class's data.

36. BCBSIL knew or should have known that Plaintiff's and the Class's Sensitive Information was a target for malicious actors.

37. Accordingly, BCBSIL knew or should have known that it needed to adequately vet, audit, or monitor Conduent if it was going to entrust Conduent with Plaintiff's and the Class's Sensitive Information.

38. Had BCBSIL adequately vetted or audited Conduent, it would have discovered that Conduent did not employ the reasonable data security measures necessary to protect Plaintiff's and the Class's Sensitive Information.

39. Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Sensitive Information by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted Sensitive Information.

**D. Defendants' Data Security Failures Have Harmed Plaintiff and the Class**

40. Personal Information is valuable property. Its value is axiomatic, considering the market value and profitability of "Big Data" to corporations in

America. Illustratively, Alphabet Inc., the parent company of Google, reported in its 2020 Annual Report a total annual revenue of $182.5 billion and net income of $40.2 billion.[11] $160.7 billion of this revenue derived from its Google business, which is driven almost exclusively by leveraging the Personal Information it collects about users of its various free products and services.

41. Criminal law also recognizes the value of Personal Information and the serious nature of the theft of Personal Information by imposing prison sentences. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Personal Information. Once a cybercriminal has unlawfully acquired Personal Information, the criminal can demand a ransom or blackmail payment for its destruction, use the Personal Information to commit fraud or identity theft, or sell the Personal Information to other cybercriminals on the black market.

42. The U.S. Government Accountability Office ("GAO") released a report as far back as 2007 regarding data breaches, finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit

[11] *Alphabet Inc., Annual Report (Form 10-K)*, SEC, at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

record."[12] This has not changed over the nearly two decades since this study.

43. The GAO Report explains that "[t]he term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name."

44. Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[13] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; or use the victim's information in the event of arrest or court

[12] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5].

[13] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things: "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

action.[14]

45. With access to an individual's Personal Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and Social Security number to obtain government benefits; filing a fraudulent tax return using the victim's information; or committing healthcare fraud using information related to an individual's health insurance. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[15]

46. Identity theft presents many challenges. In a survey, the Identity Theft Resource Center ("ITRC") found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[16]

---

[14] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Private Information and How Can You Protect Yourself*, Experian (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[15] *Id.*

[16] *ITRC Annual Data Breach Report 2023*, ITRC (2023), https://www.idtheftcenter.org/publication/2023-data-breach-report/.

47. Theft of Social Security numbers creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new Social Security number, a breach victim has to demonstrate ongoing harm from misuse of their Social Security number, and a new Social Security number will not be provided until after the victim experiences the harm.

48. Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity.

49. Theft of Sensitive Information is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[17]

50. Medical identity theft "is also more difficult to detect, taking almost twice as long as normal identity theft."[18] In warning consumers of the dangers of medical identity theft, the FTC states that an identity thief may use Personal

---

[17] Patrick Lucas Austin, "*It Is Absurd." Data Breaches Show It's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 PM), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[17] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, World Privacy Forum (Dec. 12, 2017), https://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[18] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, World Privacy Forum (Dec. 12, 2017), https://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

Information "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[19] The FTC also warns, "[i]f the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[20]

51. A report published by the World Privacy Forum[21] and presented at the U.S. FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services not sought or received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[19] *See* FBI, Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain (Apr. 8, 2014) at 14, https://publicintelligence.net/fbi-health-care-cyber-intrusions/.
[20] *See* What to Know About Medical Identity Theft, FTC, https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 26, 2024).
[21] Dixon & Emerson, supra, n. 25.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgages or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.

52. Beyond monetary losses and healthcare fraud, data breaches also have a deep, psychological impact on their victims.

> In some ways, a cyber attack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread. Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyber attack. While expected, these emotions can paralyze you and prolong or worsen a cyber attack.[22]

53. Plaintiff and the Class suffered injuries in a number of ways, including:

- Loss of benefit of their bargain, for individuals who provided compensation to entities to safely transfer and store their data with one of the Defendants or Defendants' vendors;
- Loss of value of their personal information, in that it has been misused for purposes to which they did not consent, and they have not been properly compensated for this misuse;
- Actual or attempted fraud, misuse, or identity theft caused by the Data Breach, including, but not limited to, their information being published to the clear, deep,

[22] Amber Steel, *The Psychological Impact of Cyber Attacks*, LastPass (Aug. 17, 2022), https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks.

and dark web; as well as

- Time and expenses that were reasonably spent to mitigate the impact of the breach, including the cost of credit monitoring.

54. The harm already suffered by Plaintiff demonstrates that the risk of harm to Plaintiff and Class members is present and ongoing.

55. The risk of identity theft after a data breach is lasting. The U.S. Government Accountability Office's research into the effects of data breaches found that "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web—as is the case in this Data Breach—fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot rule out the significant risk of future harm."[23]

**E. Plaintiff's Experience**

56. In order to receive health care, Plaintiff provided Blue Cross and Blue Shield of Illinois with his highly personal information, including PII and PHI. In doing so, Plaintiff expected that his Sensitive Information would remain safeguarded and would not be accessible by unauthorized third parties.

[23] Report to Congressional Requesters, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 29 (Jun. 2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 30, 2018).

57. However, on or about November 3, 2025, Plaintiff St. John received notice from Conduent explaining that Conduent provided services to Blue Cross and Blue Shield of Illinois and that, in the process of providing those services, Conduent acquired Plaintiff's highly sensitive information including: "address, date of birth, social security number, treatment or diagnosis information, treatment cost information, treatment date information, health insurance number, and provider information."

58. Conduent failed to protect that highly sensitive information and, as a direct result, Plaintiff St. John's Sensitive Information fell in the hands of cybercriminals.

59. Conduent explained that it "sincerely regret[ted] any issue" that the breach may have caused. And as a token of their apology, Conduent offered a mere 12 months of credit monitoring and identity restoration services.

60. Plaintiff St. John is very careful about sharing and protecting Sensitive Information. Plaintiff has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured channel.

61. Plaintiff St. John suffered actual injury from having his sensitive information exposed and/or stolen as a result of the Data Breach, including but not limited to: (a) mitigation efforts, including monitoring of Plaintiff's credit and account and other efforts to ensure that his information is not being used for

financial, medical, and identity theft or fraud, and time and expense thereof; (b) damages to and diminution of the value of his Sensitive Information, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; and (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft.

62. In addition, knowing that hackers accessed his Sensitive Information and that this likely has been and/or will be used in the future for financial, medical, and identity theft has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

63. Despite Defendants' failure to reasonably protect Plaintiff's and the Class's Sensitive Information, it has not offered any compensation or adequate remedy, especially considering the significant and long-term risk Plaintiff and the Class face.

## CLASS ALLEGATIONS

64. Plaintiff brings this action on behalf of himself and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 and seeks certification of the following Nationwide Class:

> All individuals that received or were otherwise sent notice that their data was potentially compromised due to Defendants' Data Breach.

65. Excluded from the class is Conduent and its subsidiaries and affiliates; all employees of Conduent; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

66. Plaintiff reserves the right to, after conducting discovery, modify, expand or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

67. **Numerosity**. Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are over one million members of the Class. The number of reportedly impacted individuals already exceeds 10 million. The precise number of class members, however, is unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

68. **Commonality and Predominance**. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any

questions affecting individual Class members. These common questions include, without limitation:

a. Whether Conduent knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

b. Whether Conduent controlled and took responsibility for protecting Plaintiff's and the Class's data when solicited that data, collected it, and stored it on its servers;

c. Whether Defendants' security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

d. Whether Conduent owed Plaintiff and the Class a duty to implement reasonable security measures;

e. Whether Defendants' failure to adequately secure Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

f. Whether Defendants' failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiff's and the Class's data;

g. Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h. Whether Plaintiff and the Class were injured and suffered damages or other losses because of Defendants' failure to reasonably protect its data systems; and

i. Whether Plaintiff and the Class are entitled to relief.

69. **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class. Plaintiff and the Class are each persons whose data was

provided to Conduent, whose data resided on Conduent's servers, and whose Sensitive Information was exposed in Defendants' Data Breach. Plaintiff's injuries are similar to other class members and Plaintiff seeks relief consistent with the relief due to the Class.

70. **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Conduent to obtain relief for himself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

71. **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision

by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

72. **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), Conduent, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## CAUSES OF ACTION

### COUNT I
### Negligence

73. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

74. Defendants owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiff and the Class and managed and stored. This duty arises from multiple sources.

75. Defendants owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target Defendants' data systems and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed. Conduent alone controlled its technology, infrastructure, and

cybersecurity. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. Furthermore, Defendants knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendants' unsecured, unreasonable data security measures.

76. Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendants' duty to Plaintiff and the Class. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect sensitive data. Defendant, therefore, was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendants' duty to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendants acted in violation of § 5 of the FTCA.

77. Defendants are obligated to perform its business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring Defendants to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.

78. Finally, Defendants assumed the duty to protect patients' sensitive data by soliciting, collecting, and storing individuals' data and, additionally, by representing to its customers that it would keep their customers' data safe.

79. Defendants breached their duty to Plaintiff and the Class by implementing unreasonable data security measures that it knew or should have known could cause a Data Breach. Conduent knew or should have known that hackers might target sensitive data that Defendants solicited and collected on its users and, therefore, needed to use reasonable data security measures to protect against a Data Breach.

80. Defendants were fully capable of preventing the Data Breach. Conduent knew or should have known of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. Defendants thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

81. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

**COUNT II**
**Negligence *Per Se***

82. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

83. Defendants' unreasonable data security measures and failure to timely notify Plaintiff and the Class of the Data Breach violates Section 5 of the FTC Act. Although neither the FTC Act nor HIPAA create a private right of action, both require businesses to institute reasonable data security measures and breach notification procedures, which Defendants failed to do.

84. Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect users' sensitive data. The FTC publications and orders described above also form the basis of Defendants' duty.

85. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect individuals' personally identifying information and sensitive data and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the sensitive nature and amount of data

it stored on individuals and the foreseeable consequences of a Data Breach should Defendants fail to secure its systems.

86. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

87. Plaintiff and the Class are within the class of persons Section 5 of the FTCA (and similar state statutes) was intended to protect. Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiff and the Class.

88. Defendants, an insurer and a business associate to an insurer, were required to abide by HIPAA.

89. As a direct and proximate result of Defendants' negligence per se, Plaintiff and the Class have suffered and continue to suffer injury.

## COUNT III
## Declaratory and Injunctive Relief

90. Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

91. Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the

parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

92. An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

93. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed, and continues to owe a legal duty to secure the sensitive information with which it is entrusted, specifically including patients' personal and health information, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

b. Defendants breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and

c. Defendants' breach of its legal duty continues to cause harm to Plaintiff and the Class.

94. The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect its individuals' (*i.e.* Plaintiff's and the Class's) data.

95. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems. If another breach of Defendants' data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

96. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

97. Issuance of the requested injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of himself and the Class, requests that this Court award relief as follows:

a. An order certifying the class and designating Plaintiff as the Class Representative and their counsel as Class Counsel;

b. An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

c. A declaratory judgment in favor of Plaintiff and the Class;

d. Injunctive relief to Plaintiff and the Class;

e. An award of attorneys' fees and costs as allowed by law; and

f. An award such other and further relief as the Court may deem necessary or appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial for all the claims so triable.

Dated: November 10, 2025 Respectfully submitted,

By: *__/s/ James E. Cecchi______*

James E. Cecchi
Jason H. Alperstein
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700

jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

Brian C. Gudmundson*
Michael J. Laird*
Madison M. DeMaris*
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
madison.demaris@zimmreed.com

*Counsel for Plaintiff and the Proposed Class*

*pro hac vice forthcoming